UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

David Torgerson and
Jami Mundell,

       Plaintiffs,

v.                               Civil No. 07-1968 (JNE/JJG)
                                   ORDER

City of Rochester,

       Defendant.

---

Leslie L. Lienemann, Esq., Culberth & Lienemann, LLP, appeared for Plaintiffs David
Torgerson and Jami Mundell.

Patricia Y. Beety, Esq., League of Minnesota Cities, appeared for Defendant City of Rochester.

---

       David Torgerson and Jami Mundell bring this action against the City of Rochester (City)

claiming the City's decision not to hire them as firefighters violated state and federal law.

Torgerson, a Native American male, alleges discrimination on the basis of national origin.

Mundell, a white female, alleges that the City did not hire her because of her sex.  Plaintiffs

make claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C §§ 2000e to

2000e-17 (2000), and the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.01-.41

(2006).  In addition, Torgerson brings a claim under 42 U.S.C. § 1981 (2000).  The case is before

the Court on the City's motion for summary judgment.  For the reasons set forth below, the

Court grants the motion.

## I.      BACKGROUND

### A.    City's Process for Hiring Firefighters

       In accordance with Minn. Stat. § 420.06 (2006), the City's Fire Civil Service

Commission (Commission) has control and supervision over the employment of all officers of

the City's Fire Department.  There are three Commissioners, and any Commission action requires an affirmative vote of at least two Commissioners.

The process for hiring firefighters is set forth in the Commission's Fire Civil Service Rules and Regulations (Regulations).  According to the Regulations, candidates for firefighter positions must pass written and physical fitness tests to be eligible for appointment.  The Regulations require notice of an upcoming examination to be published in the "official newspaper"[1] and posted in city hall and at each fire station at least thirty days before the examination.  The City's Human Resources (HR) Department reviews written applications for posted vacancies to determine if the candidates meet the minimum qualifications for the position.  All candidates meeting the minimum qualifications advance to the examination process.

Phase I of the examination process is a written test, which counts for thirty percent of a candidate's final score.  The candidates who receive the fifty highest scores on the written test advance to Phase II, the physical agility test.  The physical agility test accounts for thirty percent of a candidate's final score.[2]  Of those fifty candidates, those who pass the physical agility test advance to Phase III, which is an interview with a three-person panel.  One panel interviewer represents the Commission, one represents the City's HR Department, and one represents the Fire Department.  All three panel interviewers score a candidate's responses to the interview questions on a scale of 1-10.[3]  The panel interview accounts for forty percent of a candidate's

---

[1]     The record does not indicate which newspaper is the official newspaper.

[2]     Applicants are awarded points for Phase II based on the time it takes them to complete the agility test.  An applicant who takes more than 6 minutes and 30 seconds to complete the agility test fails the test and cannot continue in the examination process.

[3]     The City converts the scores awarded during the panel interview to "raw" scores using a process not described in the record.  Plaintiffs do not challenge the conversion process here.

final score.  After completion of the panel interview, the candidates' "raw" scores for each phase are converted to "eligibility points" by multiplying the raw score for each phase by the weight assigned to the phase.  A candidate's final score is the total of his or her eligibility points, including any veteran's points awarded in accordance with Minn. Stat. § 197.455 (2006).[4]  The candidates are placed on an eligibility list in rank order based on their final score.  The Commission certifies the eligibility list, which stands for two years.  All candidates on the eligibility list are qualified for the position of firefighter.

According to the Regulations, when a vacancy is anticipated or occurs, the Fire Chief shall make a written request to the Commission to certify to the City Council the names of the persons eligible for appointment.  Minnesota Statutes § 420.07(7) (2006) requires the Commission to certify "the three names standing highest on the appropriate list to fill any vacancy" (rule of three).  Minnesota Statutes § 420.07 and the Regulations permit, but do not require, the certification of up to two eligible candidates from each protected group for which a disparity exists between the composition of the Fire Department and the City's approved affirmative action goals (expanded certification).  The expanded certification is in addition to the rule of three certification and is made in rank order.[5]  Each candidate eligible for certification for appointment, including any protected group candidates, must pass a background check and an interview with the Fire Chief.  Candidates must also pass medical and psychological examinations.

---

[4]     Non-disabled veterans receive a credit of five eligibility points and disabled veterans receive a credit of ten eligibility points.

[5]     The expanded certification may not include a member of a protected group if a member of that group is one of the three candidates certified under the rule of three.  Minn. Stat. § 420.07.

3

According to the Regulations, if a candidate fails the interview with the Fire Chief, background check, medical examination, or psychological examination, the Commission considers the next qualified candidate on the eligibility list.  The City Council makes the final hiring decision, but according to City Councilmember Patrick Carr, the City Council abides by the recommendations made by the Commission.  In the past, the City has used an expanded certification to hire women and non-white firefighters who were not ranked at the top of the eligibility list.

**B.**      **Challenged Hiring**

In fall 2005, the City began a hiring process that resulted in the certification of forty-eight candidates on the eligibility list.  The eligibility list included three protected group candidates: Mundell, a white female; Torgerson, a Native American male; and a second white female.

At the end of the written and agility phases of the examination process, Torgerson was ranked 41st and Mundell was ranked 46th.  Plaintiffs do not challenge these phases of the examination process.  Both candidates advanced to the panel interview phase.  According to Deputy Chief Dan Slavin[6], who represented the Fire Department at half of the interviews, an outside company gave the panel interviewers a set of interview questions and instructed them on how to ask the questions and what responses were considered good responses.  Fire Chief David Kapler testified that panel interviewers were given scoring criteria establishing what indicators showed that a candidate did or did not have desired qualities, but that there was a "degree of subjectivity" to the panel interview.

---

[6]      The Court refers to City employees according to their titles at the time of the challenged hiring.

Plaintiffs testified that they received a list of possible interview questions about ten to fifteen minutes before their panel interviews and that the panel interviewers took turns asking the interview questions.  Mundell's score sheet indicates that Battalion Chief Charles Hermann, HR Risk Management Analyst Joan Till-Born, and Commissioner Joe Powers conducted Mundell's interview.  According to Torgerson's score sheet, Till-Born, Hermann, and Commissioner John Withers conducted Torgerson's panel interview.  Mundell testified that the questions asked of her were the type of questions she anticipated based on the list of possible questions and that she was not challenging the panel interview as part of this lawsuit.  Torgerson testified that many of the questions were "word for word" from the list of possible questions and that none of the questions was inappropriate.  Mundell and Torgerson scored 37th and 41st, respectively, on the panel interview phase.

The Commission certified the eligibility list of forty-eight candidates at a meeting on November 22, 2005.[7]  All three Commissioners—Withers, Powers, and Roger Field—were present.  Mundell was ranked 40th on the eligibility list and Torgerson was ranked 45th.  The other female candidate was ranked 37th.  On December 15, 2005, Kapler sent a memorandum to the Commission asking it to forward a list of candidates from the eligibility list to fill three vacant firefighter positions and three new firefighter positions, which were authorized by a federal Staffing for Adequate Fire and Emergency Response (SAFER) grant.  The SAFER grant required the City to seek, recruit, and appoint members of racial and ethnic minority groups and women "to the extent possible."  On January 9, 2006, Kapler asked the Commission to hire a seventh firefighter as a replacement for a terminated firefighter.

---

[7]     The record does not indicate what happened to two of the original fifty candidates who passed the written exam.

As illustrated in the following example, operation of the rule of three requires the Commission to certify nine candidates for seven open positions.[8]  The Commission must certify the first-, second-, and third-ranked candidates for the first position.  Then, assuming the City appoints the highest-ranked candidate for each position, the Commission must certify the second-, third-, and fourth-ranked for the second position, the third-, fourth-, and fifth-ranked candidates for the third position, and so on, until certifying the seventh-, eighth-, and ninth-ranked candidates for the seventh position.  The Commission may also certify protected group candidates in addition to the rule of three candidates pursuant to the expanded certification procedure.

According to the meeting minutes, when the Commission met on January 18, 2006, it discussed the purpose of the SAFER grant and whether the Commission should expand the certification to include protected group candidates.  HR Director Linda Gilsrud noted the "minimal differences in the total points between candidates" on the eligibility list.  Powers opined that while all candidates on the eligibility list are qualified, the rank order should be carefully considered.  Withers questioned whether a lower-ranked candidate could perform the job requirements and Deputy City Attorney David Goslee clarified that all of the candidates met the examination requirements.  Withers then moved to certify to the City Council the rule of three candidates in rank order for six appointments and the rule of three candidates plus an

---

[8]     The example assumes that none of the nine candidates is eliminated by the interview with the Fire Chief, background check, medical examination, or psychological examination.

expanded certification for the seventh appointment.  The Commission unanimously approved

Withers's motion.[9]

Kapler, with the assistance of Slavin, interviewed Candidates 1-9—all white males—and

the three protected group candidates.[10]  When interviewing the top-ranked candidates, Kapler

looked to see if there was a "red flag.  Something that show[ed] up.  It could be a gut-level

feeling . . . that might give us a clue that there is a concern about a candidate."  When

interviewing the protected group candidates, Kapler looked to see if there was "something that

might have been missed.  Is there some quality or attribute this person brings that didn't come

out in the test that we can say, wow, this is a strong candidate regardless of their test scores."

Kapler failed Candidate 3 because he did not have his National Registry of Emergency

Medical Technicians (NREMT) certification.  According to the Regulations, candidates must

"present current [NREMT] certification or verification of registry eligibility" before certification

of the eligibility list.  Kapler also failed Candidate 4 because he did not appear for his interview.

Kapler then interviewed four additional candidates—Candidates 10-13.  On February 13, 2006,

Kapler issued a memorandum containing his recommendations.  In addition to not

recommending Candidates 3 and 4, he also did not recommend Candidate 10 because he "was

not eligible for [NREMT registry] before the [eligibility] list was certified" and Candidate 11

because he did "not demonstrate the level of maturity and preparedness to be successful."

Kapler also did not recommend the three protected group candidates because they did not

"demonstrate[] themselves to be equally or better qualified" than the recommended individuals.

---

[9]     The record does not reflect why the Commission decided to certify candidates to the City
Council in advance of the required background check, medical evaluation, psychological
evaluation, and interview with the Fire Chief.

[10]     The Court refers to the candidates by reference to their ranking on the eligibility list.

The Commission discussed Kapler's recommendations on February 27, 2006. All three Commissioners were present. At that meeting, Kapler indicated that he no longer recommended two additional candidates—Candidate 2 because Kapler did not expect the results of the candidate's medical examination in time for hiring and Candidate 5 because he did not have his NREMT certification when the eligibility list was certified. Of the top thirteen candidates, Kapler did not recommend six, leaving the Commission with only seven recommended candidates. Kapler requested an additional four candidates for interviews, and the Commission tabled the recommendations for appointment.

Later in the meeting, two of the candidates deemed ineligible because they lacked NREMT certification questioned the meaning of the NREMT "registry eligible" requirement. After discussing whether the candidates received conflicting information about the meaning of NREMT "registry eligible," the Commission tabled the issue and requested clarification from the Fire Department. The Commission then unanimously voted to permit the three candidates Kapler had not recommended because they lacked NREMT certification or were not NREMT registry eligible (collectively, non-NREMT candidates) to continue in the selection process.

According to Gilsrud, the City decided that the non-NREMT candidates were eligible for appointment because it determined that the information provided to candidates regarding the meaning of NREMT "registry eligible" was ambiguous. On March 15, 2006, Kapler issued a memorandum recommending Candidates 1-3 and 5-10 for appointment.[11] Kapler testified that he changed his recommendation as to the non-NREMT candidates "[o]nce the commission

---

[11]     The record does not reflect why Kapler changed his recommendation with respect to Candidate 2, whom he had not recommended on February 27 because the results from the candidate's medical examination were not expected in time for hiring. Plaintiffs do not challenge Kapler's changed recommendation with respect to Candidate 2 here.

declared them eligible." Kapler made no mention of the protected group candidates or Candidates 11-13 in his March 15 memorandum. At a Commission meeting on the same day, Withers and Powers voted to present the candidates as recommended by Kapler to the City Council. Field was not present.

The City Council appointed Candidates 1-3 and 5-8 as firefighters as part of its consent agenda on March 20, 2006. Shortly after the City Council's appointments, the press released the news that one of the appointed firefighters had been convicted of vehicular homicide.[12] In response to calls from constituents about the appointments, Carr investigated the City's hiring process. During the course of his investigation, Carr concluded that the SAFER grant required the City to seek, recruit, and appoint women and minorities. At an emergency meeting called to decide whether to reconsider the appointments based on the appointment of a convicted felon, Carr attempted to discuss whether the City had complied with the SAFER grant. Goslee advised the City Council that compliance with the SAFER grant was not a topic for the emergency meeting. The City Council did not discuss the SAFER grant and decided not to reconsider the seven appointments, resulting in the hiring of Candidates 1-3 and 5-8.

Plaintiffs filed discrimination charges with the Minnesota Department of Human Rights (MDHR) and the Equal Employment Opportunity Commission (EEOC). The MDHR found that the evidence did not substantiate Plaintiffs' allegations and issued right-to-sue letters in March 2007. The EEOC adopted the MDHR's findings and issued right-to-sue letters in April 2007.

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[12]    The Regulations permit, but do not require, the Commission to reject an applicant any time before the examination process or remove an applicant from the eligibility list any time before actual appointment if the applicant was guilty of a crime.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant satisfies its burden, the nonmovant must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.    Torgerson's Section 1981 Claim

The City contends that Torgerson's claim under 42 U.S.C. § 1981 should be dismissed because he based his claim on national origin rather than race. Section 1981 does not apply to claims of discrimination based on national origin. *See Zar v. S.D. Bd. of Examiners of Psychologists*, 976 F.2d 459, 467 (8th Cir. 1992) (holding claim of discrimination based on national origin is insufficient to state a § 1981 claim). Torgerson contends that his § 1981 claim should not be dismissed because it is based on his Native American status and claims based on Native American status have been treated as both race and national origin claims.

A party may bring a claim of discrimination based on Native American status as a claim based on race, national origin, or both. *See Dawavendewa v. Salt River Project Agr. Imp. & Power Dist.*, 154 F.3d 1117, 1119 n.4 (9th Cir. 1998) ("claims of discrimination on the basis of one's status as a Native American are often brought as race discrimination claims, although they have also been brought as national origin claims" (citations omitted)). Torgerson, however, only asserted discrimination "on the basis of his national origin" in his Complaint. Further, Torgerson

testified during his deposition that he believed the City discriminated against him based on his national origin.  At no point prior to the City's motion for summary judgment had Torgerson alleged discrimination based on race.  Torgerson's belated assertion of racial discrimination is insufficient to avoid summary judgment.[13]  *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1056-57 (8th Cir. 2004).

**B.      Plaintiffs' Title VII and MHRA Claims**

Torgerson and Mundell make disparate treatment claims under Title VII and the MHRA alleging discrimination on the basis of Torgerson's national origin and Mundell's sex.  Title VII provides that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . because of such individual's . . . sex . . . or national origin."  42 U.S.C. § 2000e-2(a)(1).  The MHRA states that "it is an unfair employment practice for an employer . . . because of national origin [or] sex . . . to . . . refuse to hire" or "discriminate against a person with respect to hiring." Minn. Stat. § 363A.08, subd. 2.  The Court analyzes MHRA and Title VII claims using the same standard.  *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005).

Plaintiffs may survive summary judgment on their disparate treatment claims by presenting either "direct evidence" of discrimination or "creating the requisite inference of unlawful discrimination" under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *See Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).  In the context of employment discrimination cases, "direct evidence" is not the opposite of circumstantial evidence.  *See id.*  Rather, the term "direct" refers to the causal strength of the proof.  *Id.*  "[D]irect evidence is evidence 'showing a specific link between the alleged

---

[13]      Even if Torgerson had pleaded or asserted racial discrimination during this litigation, his § 1981 claim would still fail for the same reasons his Title VII and MHRA claims fail.  *See Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003).

discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *See id.*  A plaintiff with direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to survive summary judgment, even if the strong evidence is circumstantial.  *Id.*  A plaintiff who lacks evidence that clearly points to the presence of an illegal motive, however, can only avoid summary judgment by creating the requisite inference of unlawful discrimination under the *McDonnell Douglas* framework.  *Id.*

Under the *McDonnell Douglas* framework, "once the plaintiff employee establishes a prima facie case of discrimination, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions."  *See Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 914 (8th Cir. 2007).  If the defendant offers a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination.  *Id.*

**1.     Claims of Direct Evidence**

Plaintiffs contend that two Commissioners made statements that are direct evidence of discrimination.  It is worth noting that the parties treat the concept of "direct" evidence as if it were the opposite of "circumstantial" evidence.  As the Court has just noted, in this circuit, the term "direct" evidence has a different meaning in this context.

First, Plaintiffs offer Carr's testimony that Field said that he was not aware of the terms of the SAFER grant with respect to hiring minorities and women and that if he had been aware of the terms, he would have recommended that the City not take the grant.  The City contends that Field's statement is inadmissible hearsay that Plaintiffs cannot rely on to avoid summary

judgment.  Because the Court concludes that taken either alone or in combination, neither statement constitutes direct evidence of discrimination, it need not determine whether the statements are inadmissible hearsay.  *See Sokol & Assoc., Inc. v. Techsonic Indus., Inc.*, 495 F.3d 605, 611 (8th Cir. 2007).

The Court turns to Field's statement, which the Court considers in the context of his conversation with Carr.  *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006).  Carr described the conversation as follows:

> I said—the first question I asked [Field] was are you aware of all of the terms and conditions of the SAFER grant.  And then he said what do you mean?  And I said, well, they stipulated you hire women and minorities.  And he said I knew nothing of that.  He said had I known, I would have recommended that the City not take the grant.  He said the City should never have taken the grant if that was the stipulation.

As related by Carr, his description of the SAFER grant failed to mention the qualifying language "to the extent possible" in the section requiring recipients to seek, recruit, and appoint members of racial and ethnic minority groups and women.[14]  Testimony that Field recommended against taking a grant that "stipulated" the City hire women and minorities, regardless of relative qualifications, is not evidence of discriminatory animus.  At most, it is evidence of concern that the Commissioners have the discretion to hire the best-qualified firefighters.

Further, even if the Court assumes that Field's statement meant he would recommend against receiving a grant requiring the City to hire women and minorities "to the extent possible," Field's statement has not been linked to any challenged decision.  Direct evidence does not include statements by decisionmakers unrelated to the decisional process itself.  *Twymon*, 462 F.3d at 933.  There is no evidence that Field, who did not participate in Plaintiffs'

---

[14]    Carr testified that his interpretation of the phrase "to the extent possible" in the SAFER grant requirements meant the City should have hired women and minorities even if they were not the best-qualified candidates.

panel interviews, could have affected Plaintiffs' ranking on the eligibility list.  Field also did not

participate in Plaintiffs' interviews with the Fire Chief.  Moreover, Field was not present at the

meeting on March 15, 2006, where the Commission voted to certify Candidates 1-3 and 5-10 to

the City Council, but did not expand the certification.  There is no evidence that Field influenced

the City Council's decision not to reconsider the appointments.  Because Field's statement is

unrelated to any challenged step in the decisional process, the Court cannot conclude that Field's

statement is direct evidence of discrimination.

Second, Carr testified that Withers said that he recommended a candidate who was a

convicted felon because "[the candidate] was a big guy and [] he'd make a good firefighter."

Plaintiffs assert that Withers's statement indicates that he acted with discriminatory animus.

With respect to whether Withers's statement reveals a discriminatory animus toward women, the

Court must consider the context in which Withers made the statement.  *See Twymon*, 462 F.3d at

934.  Withers made the statement while justifying the appointment of a convicted felon to a

firefighter position.  Withers's statement is devoid of reference to women, and according to Carr,

Withers did not indicate that he had any concerns about a female's ability to meet the physical

demands of firefighting.  Wither's observation that a candidate was a "big guy" and assessment

of the candidate's potential as a firefighter in defense of the decision to appoint the candidate is

not evidence of discriminatory animus toward women.

Further, even if the Court assumes that Withers's statement is evidence of discriminatory

animus toward women, the only challenged decision relating to Mundell to which Withers has

any connection is the Commission's vote on March 15 to certify only the top-ranked candidates

to the City Council.  Withers, however, moved and voted to expand the certification to include

the protected group candidates for the seventh position on January 18.  He changed his vote after

Kapler recommended against their appointment.  Given these facts, Withers's statement is insufficient to support a finding by a reasonable fact finder that discriminatory animus toward women motivated the City's decision not to appoint Mundell, and is not direct evidence of discrimination.[15]

With respect to Torgerson, Withers's statement did not refer to Native Americans or national origin.  Withers's facially-neutral statement, without more, is not direct evidence of discrimination against Torgerson based on his Native American status.  *See Twymon*, 462 F.3d at 934.

### 2.      Claims of Indirect Evidence

The Court turns to whether Plaintiffs have created the requisite inference of unlawful discrimination under the *McDonnell Douglas* framework.  The parties dispute whether Plaintiffs have established a prima facie case of discrimination.  For the purposes of summary judgment, the Court will assume, without deciding, that Plaintiffs have made a prima facie showing.  *See Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 857 (8th Cir. 2008).

The City contends that Plaintiffs' lower ranking on the eligibility list is a legitimate, nondiscriminatory reason for its decision not to hire them.  Plaintiffs respond that the City's explanation is pretext for discrimination.  To succeed on this claim, Plaintiffs must both discredit the City's reason for not hiring them and show that circumstances permit drawing the reasonable

---

[15]      Plaintiffs note in their brief that Withers and Powers signed "Fire Civil Service Commission Review" forms (review forms) for Plaintiffs early in March 2006, before the Commission's March 15 vote to certify Candidates 1-3 and 5-10 to the City Council.  Field never completed review forms for Plaintiffs.  Withers and Powers both indicated "yes" in a section of the form titled "recommendation for appointment."  Gilsrud testified that the forms meant that the Commissioner had reviewed each candidate's application packet, found all items were present, and determined that the person could be recommended based on the information. Plaintiffs do not explain the relevance of the forms to their discrimination claims and have not offered any evidence contradicting Gilsrud's testimony.  The Court concludes that the review forms do not support an inference of discrimination.

inference that the real reasons they were not hired were that Mundell is female and Torgerson's national origin is Native American. *See Johnson v. AT&T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005). There are at least two ways a plaintiff can establish a question of fact regarding pretext. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006). A plaintiff may show pretext with evidence that the employer's explanation is unworthy of credence because it has no basis in fact. *Id.* (quotation marks and citation omitted). Alternatively, a plaintiff may show pretext by persuading the court that a prohibited reason more *likely* motivated the employer. *Id.* (quotation marks omitted).

Plaintiffs make several arguments regarding pretext. First, Plaintiffs attack the validity of the panel interview scores, and consequently the validity of the candidates' final ranking. "Although subjective employment procedures are susceptible of discriminatory abuse and require close scrutiny, subjectivity alone does not render an employment decision infirm." *Brooks v. Ameren UE*, 345 F.3d 986, 988 (8th Cir. 2003) (citation omitted). The panel interview process used to interview the candidates was subject to several controls. The panel consisted of representatives from the HR Department, the Commission, and the Fire Department. Panel interviewers were given established scoring criteria and took turns asking predetermined questions. Candidates received a list of possible questions before the interview. Based on these facts, the Court concludes that the City took effective steps to minimize the panel interview's susceptibility to abuse.

Other evidence compels a conclusion that the panel interview scores are not suspect. Mundell's overall ranking increased as a result of her panel interview. The other female candidate received the fifteenth highest score on the panel interview. Although Torgerson's ranking decreased as a result of his panel interview score, he testified that he found interview

questions asking him to relate personal examples "more of a challenge" because he had not yet worked as a full-time firefighter.  Further, Plaintiffs have not offered any evidence showing that they received lower scores than white male candidates for similar answers.  Counsel for Plaintiffs stated at the hearing that they were unable to determine if Plaintiffs received lower scores for similar answers because the City had not retained the panel interviewers' notes, but also explicitly disavowed any allegations of spoliation.  In the absence of spoliation, the Court declines to read an adverse inference into the City's failure to retain the panel interviewers' notes.[16]  Plaintiffs have not shown that the panel interview scores or the final rankings had no basis in fact or that discriminatory animus more likely than not motivated the panel interviewers to give Plaintiffs lower scores.

Second, Plaintiffs contend that Kapler's application of two different standards when interviewing the protected group candidates and the top-ranked candidates is evidence of pretext.  Kapler explained that he looked for a "red flag" when interviewing the top-ranked candidates because they had already demonstrated their capabilities through the examination process.  With respect to the protected class candidates, Kapler testified that he sought to determine whether they were strong candidates in spite of their lower rankings based on attributes demonstrated during the interview that were not highlighted by the examination process.

While instances of disparate treatment can demonstrate pretext, Plaintiffs must prove they were similarly situated to the hired candidates "in all relevant respects."  *See Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005).  At the pretext stage, the test for whether Plaintiffs were similarly situated to the hired candidates is rigorous.  *See id.*  Here, Plaintiffs

---

[16]     Moreover, counsel for Plaintiffs had access to all candidates' score sheets.  Plaintiffs could have deposed other candidates to compare those candidates' answers to Plaintiffs' answers and determined if the two groups received different scores for similar answers.

were not similarly situated to the hired candidates in at least one relevant respect—their ranking on the eligibility list.  Plaintiffs contend that they were similarly situated to the hired candidates because they were qualified by virtue of their presence on the eligibility list and because Gilsrud and Kapler both acknowledged that the ranking is not a necessary hiring order due to the narrow spread of the final scores.

Although ranking is not a determinative hiring factor, the Court cannot ignore its importance.  After all, the Minnesota Legislature requires the Commission to establish "public competitive examinations to test the relative fitness of applicants," to create and maintain a list of eligible candidates "*in order of their standing* in the examination," and to certify "the three names standing highest" on the list of eligible candidates for any vacancy.  Minn. Stat. § 420.07(2), (4), (7) (emphasis added).  The expanded certification also is made in rank order. *Id.* § 420.07.  The Legislature's focus on the candidates' rank order demonstrates its relevance. Mundell and Torgerson were ranked 40th and 45th, respectively, while the hired candidates were ranked in the top ten.  Given the significant difference in their ranking, Plaintiffs and the hired candidates were not similarly situated in all relevant respects.  Kapler's decision to evaluate the protected group candidates and top-ranked candidates according to different standards is not evidence of pretext.

Third, Plaintiffs argue that Kapler's application of a subjective standard is suspect and an indication that the City's explanations for not hiring Plaintiffs are pretext.  Kapler conceded that his interview was "wholly subjective" and that there was no objective reason why he did not recommend Plaintiffs.  The Court therefore closely scrutinizes Kapler's decision not to recommend Plaintiffs.  *See Brooks*, 345 F.3d at 988.

Kapler used his interview to measure the candidates' personality, character, and communication skills. He testified that those qualities are important because firefighting is a team environment and because firefighters need to understand, give, and repeat orders without confusion. Plaintiffs have not shown that those factors are not legitimate considerations for the City. Further, Kapler testified that the top-ranked candidates who passed his interview communicated well, understood customer service, conducted themselves well during the interview, and had good composure. In contrast, he testified that Torgerson was "awkward" in terms of his verbal abilities and "unsophisticated" and that Mundell did not demonstrate that she was better qualified than her ranking indicated.

"Where the employer contends that the selected candidate was more qualified . . . than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for an employment decision." *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 857 (8th Cir. 2003). "If this comparison successfully challenges the employer's articulated reason for the employment decision, it might serve to support a reasonable inference of discrimination." *Id.* A comparison that reveals that the plaintiff was similarly qualified or not as qualified as the selected candidate, however, does not raise an inference of discrimination. *Id.* No evidence suggests that Kapler's assessment of Plaintiffs' demeanor, personality, character, or communications skills was inaccurate. In the absence of evidence indicating that Kapler used illegitimate criteria during his interview or that Plaintiffs were more qualified than the hired candidates, the use of subjective criteria during Kapler's interview does not give rise to an inference of discrimination. *See id.* at 857-58.

Fourth, Plaintiffs challenge the fact that Slavin did not consider Plaintiffs "standouts" despite the fact that Plaintiffs possessed many of the same objective attributes as the hired

candidates.  Mundell and Torgerson had both applied to other fire departments, Mundell had participated in ride-alongs, and Torgerson had experience as a part-time firefighter.  Slavin identified these attributes when explaining why the top-ranked candidates were standouts.  Slavin also identified the top-ranked candidates' confidence, maturity level, intelligence, and responses to questions about safety and customer service as factors contributing to his conclusion that the top-ranked candidates were standouts.  Showing that Plaintiffs possessed "some of the other qualities essential for success . . . does not suffice to raise an inference that [the City's] stated rationale for giving the position to another is pretextual."  *See Lidge-Myrtil v. Deere & Co.*, 49 F.3d 1308, 1311 (8th Cir. 1995).  "[I]t it is the employer's role to identify those strengths that constitute the best qualified applicant."  *Arraleh v. County of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) (quotation marks omitted).  Plaintiffs have not shown that Slavin's assessment has no basis in fact or that discriminatory animus motivated him to find the top-ranked candidates, but not Plaintiffs, standouts.

Fifth, Plaintiffs contend that Kapler's description of the protected group candidates as "unfit" is evidence of discriminatory animus.  After Carr stated at a June 2006 meeting that the City should not hire any more firefighters under the SAFER grant because "the people that were discriminated against were going to file a complaint with [] Homeland Security[,] a human rights complaint, and . . . at some point this will probably end up in court," Kapler responded that he had interviewed the protected group candidates and "found them unfit."  When asked about his description of Plaintiffs as unfit, Kapler testified:

> Well, I guess it depends on what the word 'fit' means.  To us it has a specific connotation.  A fitness for duty type of evaluation, mental, emotional, physical, is all part of a person's fitness for duty.  So that's how I use the word fit.  They are—they are on our list as qualified candidates, so yes, they're qualified to be firefighters.

Kapler's distinction between "qualified" and "fit" does not give rise to an inference of discrimination.  Given the context of Kapler's statement and the absence of evidence suggesting that he found Plaintiffs unfit based on their protected group status, Kapler's description of Plaintiffs is not evidence of pretext.

Sixth, Plaintiffs contend that the City's decision to hire the non-NREMT candidates, all white males, is evidence of pretext.  "[The pretext] inquiry is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair or correct." *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (quotation marks omitted). Gilsrud testified that the City permitted the non-NREMT candidates to proceed because the information given the candidates regarding NREMT registry eligibility was inconsistent. Plaintiffs have not shown this explanation is false.  Instead, Plaintiffs argue that the City hired the non-NREMT candidates to avoid hiring Plaintiffs.  Plaintiffs base this contention on the erroneous premise that the City was faced with the choice between hiring the non-NREMT candidates and hiring Plaintiffs.  In fact, the City's choice was between hiring the non-NREMT candidates and moving down the eligibility list to the next candidates.  No evidence suggests discriminatory animus motivated the City's decision to hire the non-NREMT candidates.  The City's decision to do so does not give rise to an inference of discrimination.

Plaintiffs' additional claim that Kapler sought additional candidates to avoid recommending Plaintiffs is without merit.  Minnesota law required the Commission to certify the "three names standing highest" on the eligibility list.  *See* Minn. Stat. § 420.07(7).  The Regulations required candidates to pass an interview with the Fire Chief before appointment. Kapler's request for additional candidates to interview was required under Minnesota law and

the Regulations.  His decision to interview the next four candidates, who happened to be white

males, does not give rise to an inference of discrimination.

Seventh, Plaintiffs assert that the City's decision to hire five white male candidates in

August 2007 while declining to re-interview the protected group candidates is evidence of

pretext.[17]  In August 2007, the five top-ranked candidates on the eligibility list were Candidates

9-13.  The rule of three required the City to certify the top-ranked candidates if they passed the

background check, the interview with the Fire Chief, and medical and psychological

examinations.[18]  Plaintiffs contend that the City's decision to hire Candidate 11, whom Kapler

had not recommended in March 2006 because he felt the candidate lacked maturity, while

declining to re-interview Plaintiffs, is evidence of discriminatory animus.  The Court is not

persuaded.  Kapler testified that a candidate who did not pass the interview with the Fire Chief

remained on the eligibility list at the same rank.  Thus, the rule of three required consideration of

Candidate 11.  Consideration of Plaintiffs, who were ranked 40th and 45th, was not required.

The City's disparate treatment of Plaintiffs and Candidate 11 is not evidence of pretext because

they were not similarly situated in all relevant respects.  *See Rodgers*, 417 F.3d at 854.  Further,

elimination of Candidate 11 would have resulted in the City considering the next candidate on

the list, not Plaintiffs.

The Court addresses two remaining issues.  Plaintiffs, citing Carr's deposition transcript,

assert on page 18 of their brief that former Assistant Fire Chief Gary Smith "related to Carr that

he had heard Chief Kapler and Deputy Chief Lovett say they did not want women on the

---

[17]     Plaintiffs do not claim the City's decision not to re-interview them was retaliation.

[18]     Kapler re-interviewed Candidate 11 in August 2007.

department."[19]  Carr's testimony about what Smith told him about a meeting that took place

when the Fire Department hired its first female firefighter in the mid-1990s, offered to prove

what Kapler and Lovett said, is obvious hearsay.  *See* Fed. R. Evid. 801(c).  More importantly,

though, Plaintiffs' assertion is inaccurate on a critical point—the identity of the person(s) who

supposedly did not want women in the Fire Department.  In his deposition, Carr testified:

> [Smith] said that he was in a meeting with I believe Jerry Loftus—yeah, Jerry
> Loftus and others.  Rick Lovett was there, and I believe Kapler may or may not
> have been there.  I believe Kapler was there as well.  But in that narrative, he said
> that Lovett said that we don't want to hire women unequivocally . . . he said that
> Rick Lovett said that they did not want to hire women . . . .

Later, Carr testified that "Lovett said that he . . . did not want to hire women."  Contrary

to Plaintiffs' representation to the Court, Carr did not testify that Smith said that Smith had heard

*Kapler* say he did not want women in the Fire Department.  The Court "can hardly overstate the

importance of accuracy in counsel's descriptions of the record."  *Erickson v. Farmland Indus.,*

*Inc.*, 271 F.3d 718, 725 n.3 (8th Cir. 2001).  No evidence suggests that Lovett had any input into

the challenged hiring, so, even if Carr's testimony were admissible, *Lovett*'s statement would not

give rise to an inference of discrimination.

Second, Plaintiffs rely heavily on Carr's opinion of the hiring process, including Carr's

conclusion that the City discriminated against Plaintiffs, in support of their claims.  Carr lacks

personal knowledge of the challenged hiring process.  Many of his opinions were couched as

legal conclusions, which are unhelpful to the finder of fact.  For these reasons, Carr's opinions

are inadmissible.  *See* Fed. R. Evid. 701; *Hurst v. United States*, 882 F.2d 306, 312 (8th Cir.

1989) ("A lay witness may give an opinion only if it is rationally based on the perception of the

witness and would help the factfinder determine a matter in issue.").  Plaintiffs may not rely on

Carr's personal opinions to avoid summary judgment.  *See* Fed. R. Civ. P. 56(e).

---

[19]     Smith has not had any official role with the City since 1994.

Because Plaintiffs have presented no evidence discrediting the City's reason for not hiring them or giving rise to an inference of discrimination, Plaintiffs have not met their burden of showing that the City's stated non-discriminatory reason was mere pretext for discrimination. Accordingly, Plaintiffs have failed to establish that their claims of discrimination should survive summary judgment.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.     The City's Motion for Summary Judgment [Docket No. 12] is GRANTED.

2.     Plaintiffs' Complaint [Docket No. 1] is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 15, 2008

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge